MONIQUE C. WINKLER (Cal. Bar No. 213031)
JASON H. LEE (Cal. Bar No. 253140)
DAVID ZHOU (NY Bar No. 4926523)
ROBIN ANDREWS (Illinois Bar No. 6285644)
 andrewsr@sec.gov
DUNCAN C. SIMPSON LAGOY (Cal. Bar No. 298776)
 simpsonlagoyd@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 700
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| vs. | COMPLAINT |
| | **JURY DEMAND** |
| MARIA DULCE PINO DICKERSON, CREATIVE LEGAL FUNDINGS IN CA, and THE UBIQUITY GROUP LLC, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1. From approximately March 2021 through May 2023, Defendant Maria Dulce Pino Dickerson ("Dickerson") orchestrated a Ponzi-like scheme targeting Filipino Americans that used sham companies to defraud investors out of approximately $7 million. Dickerson conducted fraudulent securities offerings and sold unregistered securities to more than 130 investors who, at

her request, paid her to acquire interests of her company, Creative Legal Fundings in CA ("Creative Legal Fundings").

2. During in-person meetings, telephone calls, and online videoconferences, Dickerson made numerous material misrepresentations and omissions about Creative Legal Fundings, including that Creative Legal Fundings was in the business of lending money to personal injury lawyers to fund litigation in exchange for a share of any eventual awards or recoveries, and that Creative Legal Fundings would pay a guaranteed return on investment of 10 percent to 17.5 percent per month.

3. In reality, Creative Legal Fundings did not lend funds to personal injury lawyers or make any other investments, and it did not generate any revenues. Instead, Dickerson used new investments to make Ponzi-like payments of the promised returns to prior investors. In addition, unbeknownst to investors, Dickerson misappropriated more than $2.5 million of investor funds for her own personal benefit to pay for, among other things, a $1 million house, gambling, travel, and shopping. Eventually, in December 2022, Dickerson was unable to raise new investor funds quickly enough and stopped paying the guaranteed returns to prior investors.

4. In an effort to continue fraudulently raising funds, Dickerson shut down Creative Legal Fundings in May 2023 and opened a new company called The Ubiquity Group LLC ("Ubiquity," and, collectively with Dickerson and Creative Legal Fundings, "Defendants"). Her scheme, however, remained the same. Dickerson told prospective investors that Ubiquity also loaned money for personal injury litigation. At least one investor rolled his prior investment in Creative Legal Fundings, along with the purported earnings that he had accrued from Creative Legal Fundings' guaranteed monthly returns, into Ubiquity.

5. As a result of the conduct alleged in this Complaint, Defendants violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") and the securities registration provisions of the Securities Act.

6. In this action, the Commission seeks permanent injunctions, disgorgement of ill-gotten gains with prejudgment interest, and civil monetary penalties. The Commission also seeks

an order prohibiting Defendants from participating in the issuance, purchase, offer, or sale of any securities and prohibiting Dickerson from acting as an officer or director of any public company.

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Sections 20(b), 20(d), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)], as well as Sections 20(a), 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78t(a), 78u(d), 78u(e), and 78aa].

9. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

10. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because acts, transactions, practices, and courses of business that form the basis for the violations alleged in this Complaint occurred in this District.  For example, Dickerson established the headquarters of both Creative Legal Fundings and Ubiquity in Sacramento, California, and offered and sold interests in Creative Legal Fundings and Ubiquity from Sacramento, California.

11. Intradistrict assignment to the Sacramento Division is proper pursuant to Rule 120(d) of the Court's Local Rules because a substantial part of the events and omissions which give rise to these claims occurred in Sacramento County.

## DEFENDANTS

12. **Maria Dulce Pino Dickerson**, age 47, is a resident of Sacramento, California.  She is the founder, sole owner, and CEO of Creative Legal Fundings and sole manager of Ubiquity. She exercised control and decision-making authority over all aspects of the operations of Creative Legal Fundings and Ubiquity during the entire period covered by this Complaint.

13. **Creative Legal Fundings in CA** is a California corporation with its principal place of business in Sacramento, California.  It is not registered with the Commission in any capacity.  In

its February 14, 2023, Statement of Information filed with the California Secretary of State, its type of business is described as "Legal Funds." Dickerson is the CEO and chair of the board of directors of Creative Legal Fundings, and was the only signatory on Creative Legal Fundings' bank accounts.

14. **The Ubiquity Group LLC** is a California limited liability company with its principal place of business in Sacramento, California. It is not registered with the Commission in any capacity. Dickerson is the sole manager of Ubiquity and was the only signatory on Ubiquity's bank account.

## FACTUAL ALLEGATIONS

**A. Dickerson's Scheme to Defraud Investors**

15. Beginning in or about March 2021, Dickerson raised funds from investors by selling interests in her company, Creative Legal Fundings, which she claimed would provide investors with guaranteed high monthly returns ranging from 10 percent to 17.5 percent. She started her scheme by soliciting relatively small investments from friends, who recommended the Creative Legal Fundings investment to other potential investors. Dickerson then broadened her efforts to reach new investors by organizing in-person meetings, telephone calls, and online videoconferences during which she discussed the purported merits of investing in Creative Legal Fundings with potential investors. In particular, Dickerson, who is Filipino American, targeted other Filipino Americans with her investment pitch.

16. During those meetings and calls, Dickerson lied to prospective investors about how Creative Legal Fundings would generate the money necessary to pay the promised high returns. She falsely told investors that Creative Legal Fundings' business involved extending loans to personal injury lawyers to fund their lawsuits in exchange for a portion of any eventual settlements or recoveries. She also claimed that she used her own expertise to pick which attorneys would receive loans from the company. Moreover, she falsely told investors that two high-profile individuals – the CEO of a well-known global hospitality and entertainment company and a former biotechnology executive – had helped co-found Creative Legal Fundings with her and had already invested $3.52 million. To further the false illusion that Creative Legal Fundings was a real

business, Dickerson misleadingly directed some investors to the website of a legitimate California-based company with a similar name that does in fact provide loans to personal injury attorneys. And to suggest that Creative Legal Fundings was a successful, lucrative business, Dickerson also highlighted her own lavish lifestyle in social media posts.

17. None of these representations were true. Creative Legal Fundings did not provide any loans to personal injury lawyers or invest in any other kind of income-generating security, asset, instrument, or business activities. Instead, bank records show that investor funds were used to make Ponzi-like payments to prior investors and pay for Dickerson's personal expenses. Moreover, the two high-profile individuals cited by Dickerson were not involved in Creative Legal Fundings and did not invest any money in the company, much less the millions claimed by Dickerson.

18. These facts, however, did not stop Dickerson from making false representations to investors about the returns they would receive if they invested in Creative Legal Fundings. In both verbal statements and written investment contracts (the "Investment Contracts"), Dickerson falsely claimed that Creative Legal Fundings would provide investors with guaranteed returns every month ranging from 10 percent to 17.5 percent, depending on the size of the initial investments. She also falsely and misleadingly reassured investors that they could withdraw their entire investments, including their monthly earnings, if they provided 30 days' written notice. Investors signed Investment Contracts that spelled out these terms, and Dickerson countersigned some of them in her own name, and some in the name of Creative Legal Fundings.

19. Some of the Investment Contracts were titled "General Investors Agreement" or "Investors Agreement." Certain other Investment Contracts, which included all the same substantive terms, were styled as either a "General Partnership/Investors Agreement" or "General Partnership Agreement." Although the Investment Contracts contained boilerplate language about partners sharing in the entity's profits and losses and deciding business affairs by a majority vote, none of them were true partnership agreements because Creative Legal Fundings was a corporation, not a general partnership. As a result, the Investment Contracts did not provide any details about what business matters would require a vote, or when or how such a vote would take

place, and they did not provide investors with rights and powers that are commonplace in true general partnerships, such as the ability to initiate a ballot, the power to remove the manager of the partnership, or the right to access the entity's books and records.  Creative Legal Fundings also did not operate as a general partnership.  Investors who signed the Investment Contracts understood that they were passive investors and had no role in running Creative Legal Fundings, and they were not asked to vote on any business matters and did not receive any share of the company's net profits or losses.

20. Investors in Creative Legal Fundings expected to make a profit based on the false and misleading statements that Dickerson made to them and believed that they could rely on Dickerson's efforts and skill, including in selecting personal injury litigation to invest in, to obtain those profits.

21. From March 2021 through May 2023, Dickerson raised approximately $7 million from more than 130 investors by her offer and sale of interests in Creative Legal Fundings, which were unregistered securities.  Dickerson pooled investor funds and led investors to believe that they would receive guaranteed monthly returns based on her expertise in making loans to personal injury lawyers.  No registration statement has ever been filed or in effect with respect to these securities, and no exceptions to registration applied.  Dickerson and Creative Legal Fundings did not take steps to determine the accredited status of Creative Legal Fundings investors, and investors were not asked for, nor did they provide, any records verifying their net worth or income.  Based on their net worth and lack of professional financial qualifications, most investors were not accredited at the time of their investments; the securities laws thus prohibited Dickerson and Creative Legal Fundings from marketing a private offering to those investors.

22. Dickerson knew or was reckless in not knowing that Creative Legal Fundings did not make loans to any personal injury attorneys, and was not entitled to receive portions of any settlements or recoveries.  She had sole control of the bank accounts that contained investor funds.  Moreover, she was the CEO, chair of the board, and only decision-maker at Creative Legal Fundings.  Consequently, she knew or was reckless in not knowing that Creative Legal Fundings did not use investors' funds to invest in any type of income-generating security, asset, instrument,

or business activities. Rather, she knew or was reckless in not knowing that she engaged in a Ponzi-like scheme where she pooled new investor funds in order to pay prior investors their promised returns, while also misappropriating funds for her own personal use.

23. Dickerson's misrepresentations and omissions, including her misrepresentations and omissions concerning how she would use investors' money, were critically important to investors in deciding to purchase the interests in Creative Legal Fundings. Investors were denied the opportunity to make a fully informed investment decision.

**B.  Dickerson Tries to Keep Her Scheme Afloat After Creative Legal Fundings Collapses**

24. By approximately December 2022, Dickerson was having difficulty making the promised monthly return payments to investors. To explain the lack of payments, Dickerson falsely told certain investors that Creative Legal Fundings' bank account had been temporarily frozen because of a money laundering investigation. Later, she falsely told those investors that the Federal Bureau of Investigation had cleared her of any wrongdoing.

25. In May 2023, Dickerson told investors that she was closing down Creative Legal Fundings. Over the next few months, she emptied the bank accounts that held investor money, including by sending some money to existing investors, transferring money to her personal bank accounts, and withdrawing cash.

26. After closing Creative Legal Fundings, Dickerson formed a new company, The Ubiquity Group LLC, and invited certain investors to roll over their initial investments, as well as their purported returns, into interests in Ubiquity. Dickerson also solicited new potential investors in both California and Arizona to invest in Ubiquity. No registration statement has ever been filed or in effect with respect to Ubiquity's securities, and no exceptions to the registration requirements under the securities laws applied.

27. Dickerson recycled many of the false and misleading statements that she had used to promote Creative Legal Fundings. For example, she falsely told prospective investors that Ubiquity would pool together investor funds to provide loans to personal injury attorneys as well as certain small businesses, and Dickerson led investors to believe that they would receive

guaranteed monthly returns based on her expertise in making loans to personal injury lawyers and small businesses. The same misrepresentations about Ubiquity's supposed business appeared on the company's website and in its investment contract. In addition, the Ubiquity investment contract promised a 17.5 percent monthly dividend and stated that investors could withdraw their investments with 30 days' notice.

28. One investor, who had originally invested approximately $250,000 in Creative Legal Fundings, signed an investment contract in August 2023 that converted his interests in Creative Legal Fundings to interests in Ubiquity. According to the contract, the value of that investor's investment had supposedly ballooned to $2.5 million due to the fake monthly returns from Creative Legal Fundings.

29. Contrary to Dickerson's misrepresentations to investors, Ubiquity was another sham company. Like Creative Legal Fundings, Ubiquity did not make any loans or conduct any other business to earn revenue. Dickerson knew or was reckless in not knowing these facts. Indeed, she had exclusive control of Ubiquity's bank account and was the sole manager of the company.

30. Dickerson's misrepresentations and omissions related to Ubiquity deprived investors of important information relevant to their decision about whether to invest in Ubiquity.

### C. Misappropriation of Investor Funds

31. Dickerson did not disclose to investors that she would use investor funds for her own expenses and entertainment. For the time period from March 2021 through May 2023, she misappropriated at least $2.5 million in investor funds. She transferred more than $1 million from the bank accounts containing funds from Creative Legal Fundings investors to her own personal bank accounts, she used $1 million of investor funds to buy a personal residence, and she spent hundreds of thousands of dollars of investor funds on gambling, luxury goods, travel, and other personal expenses. Notably, Dickerson spent more than $280,000 at casinos in Las Vegas and California, almost $23,000 on designer goods, and more than $75,000 on flights and hotels. Finally, Dickerson misappropriated an additional approximately $1 million of investor funds through withdrawals of cash and cashier's checks.

32. Investors in Dickerson's scheme did not know that their money was being misappropriated by Dickerson for her own use. The investors were entitled to know this information and would have wanted to know this information prior to making their investments. Without this information, investors were denied the opportunity to make a fully informed investment decision.

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5*

33. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 32.

34. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, or of the facilities of a national securities exchange, with scienter:

   a. Employed devices, schemes, or artifices to defraud;
   b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
   c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

35. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Section 17(a) of the Securities Act*

36. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 32.

37. Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a. with scienter, employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

38. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**

*Violations of Sections 5(a) and 5(c) of the Securities Act*

39. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 32.

40. Creative Legal Fundings and Ubiquity interests offered and sold by Defendants are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 77c(a)(10)].

41. By engaging in the conduct described above, Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities through the use or medium of any prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when

no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

42. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Enter an order permanently enjoining Defendants from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**II.**

Enter an order permanently enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendant Dickerson from purchasing or selling securities for her own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

**III.**

Enter an order barring Defendant Dickerson from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**IV.**

Enter an order requiring Defendants to disgorge all ill-gotten gains received as a result of their unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

**V.**

Enter an order requiring Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 3, 2024			Respectfully submitted,

			 */s/  Duncan Simpson LaGoy*
			Duncan C. Simpson LaGoy
			Attorney for Plaintiff
			SECURITIES AND EXCHANGE COMMISSION